Appeal No. 2013-1474

# United States Court of Appeals

*for the*

# Federal Circuit

POWER TRAIN COMPONENTS, INC.,

*Plaintiff-Appellant,*

– v. –

UNITED STATES,

*Defendant-Appellee,*

– and –

THE TIMKEN COMPANY,

*Defendant-Appellee.*

ON APPEAL FROM THE UNITED STATES
COURT OF INTERNATIONAL TRADE

## BRIEF ON BEHALF OF PLAINTIFF-APPELLANT

ROBERT M. KLINGON
THE KLINGON LAW FIRM
444 East 82nd Street
14th Floor, West Tower
New York, New York 10028
(917) 309-6698

*Attorneys for Plaintiff-Appellant*

September 20, 2013

Form 9

FORM 9.  Certificate of Interest

---

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

Power Train Components, Inc.          v.   United States and The Timken Company

No. 2013-1474

## CERTIFICATE OF INTEREST

Counsel for the (petitioner) (appellant) (respondent) (appellee) (amicus) (name of party)

Appellant Power Train Components, Inc. certifies the following (use "None" if applicable; use extra sheets if necessary):

1.      The full name of every party or amicus represented by me is:

Power Train Components, Inc.

_____

2.      The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:

None

_____

3.      All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:

None

_____

4. ☐  The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court are:

Robert M. Klingon, The Klingon Law Firm

_____

July 12, 2013                                     /s/ Robert M. Klingon
_____                      _____
Date                                              Signature of counsel

                                                  Robert M. Klingon
                                          _____
                                                  Printed name of counsel

Please Note: All questions must be answered
cc: _____

124

# TABLE OF CONTENTS

Statement of Related Cases …………………………………………….. iv

Statement of Jurisdiction ……………………………………………1

Issues Presented for Review ……………………………………… 1

Statement of the Case ………………………………………………… 2

Statement of Facts ……………………………………………….. 4

    I.     Scope of the Antidumping Order ……………………… 4

    II.    The Articles Subject to the Scope Request ………………6

    III.   Commerce's Analysis ………………………………… 11

Summary of the Argument …………………………………………15

Argument ……………………………………………………….. 16

    I.     Standard of Review…………………………………….. 16

    II.    Commerce's Determination Improperly Expanded
           the Scope ……………………………………………….. 17

    III.   Commerce's Application of an "Essential Function" Test Is
           Arbitrary and Unreasonable …………………………….. 21

Conclusion and Prayer for Relief ………………………………… 27

i

# TABLE OF AUTHORITIES

**I.    Cases**

Consol. Edison v. NLRB, 305 U.S. 197, 59 S.Ct. 206 (1938)…..……...   16

Duferco Steel Inc. v. United States, 296 F.3d 1087
(Fed. Cir. 2001) ……………………………………………..   17

Legacy Classic Furniture, Inc., 807 F. Supp. 2d 1353 (CIT 2011)     13

Walgreen Co of Deerfield, IL v. United States, 620 F. 3d 1350
        (Fed. Cir. 2010) ……………………………………………..   16


**II.    Regulations**

19 C.F.R. § 351.225(k)(1) ……………………………………     3, 11, 17

19 C.F.R. § 351.225(k)(2)    …………………………………….     3, 11


**III.    Statutes**

28 U.S.C. § 1295(a)(5)…………………………………………….   1

28 U.S.C. §2107(b) …………………………………………………   1

19 U.S.C. § 1561a(b)(1)(B)(i) ……………………………………….   16

28 U.S.C. § 1581(c) …………………………………………………   1


**IV.    Administrative Determinations**

Tapered Roller Bearings and Parts Thereof, and Certain Housings
        Incorporating Tapered Rollers from Hungary, Italy, Japan, The
        People's Republic of China, Romania and Yugoslavia:
        Determinations of the Commission, USITC Pub. 1899 (1986)
        …………………………………………………………………..   5

Tapered Roller Bearings and Parts Thereof, Finished or
Unfinished, From the People's Republic of China, 52 Fed. Reg. 22,667
(June 15, 1987)…………………………………………………..    2


Tapered Roller Bearings and Parts Thereof, Finished or Unfinished,
from the People's Republic of China, 76 Fed. Reg. 3,086, 3,087
(Jan. 19, 2011) ... …………………………………………..    4

## <u>STATEMENT OF RELATED CASES</u>

Pursuant to Federal Circuit Rule 47.5, the appellant states that no other appeal from this civil action was previously before this or any other appellate court; and counsel does not know of any other cases that will directly affect or be directly affected by the Federal Circuit's decision in this pending appeal.

## STATEMENT OF JURISDICTION

1.      The jurisdiction of the Court of International Trade (the "CIT"),

from which this appeal was taken, was pursuant to 28 U.S.C. § 1581(c).  The

CIT's final judgment disposed of all the parties' claims.

2.      This Court has jurisdiction to hear this appeal pursuant to 28

U.S.C. § 1295(a)(5).

3.      The notice of appeal was filed timely, on June 28, 2013, within

sixty days of the CIT judgment, issued on May 29, 2013.  Fed. R. App. Proc.

4(a)(1)(B), 28 U.S.C. § 2107(b).

## ISSUES PRESENTED FOR REVIEW

1.      Whether the CIT erred in affirming the Department of

Commerce's ("Commerce") determination that certain automotive wheel

hub assemblies imported by New Trend Engineering, Ltd. ("New Trend")

are within the scope of the antidumping duty order on tapered roller bearings

("TRB") from the People's Republic of China ("China"), despite their

having structures and functions essential to the performance of the imported

articles that are independent of the structure and function of the TRBs they

contain and not described in the scope of the antidumping order.

## STATEMENT OF THE CASE

This case is an appeal from an adverse scope ruling issued by Commerce. The question is whether certain automotive wheel hub assemblies can be fairly held to be within the scope of an antidumping order that describes only tapered roller bearings, their parts, and housed tapered roller bearings. The imported merchandise at issue is many models of advanced integrated wheel hub assemblies into which power train, braking and anti-lock braking system parts and functions have been incorporated, in addition to housed tapered roller bearings that reduce friction.

The antidumping order was published in 1987. Tapered Roller Bearings and Parts Thereof, Finished or Unfinished, From the People's Republic of China, 52 Fed. Reg. 22,667 (June 15, 1987). On March 5, 2010, New Trend Engineering Ltd. filed a request for a scope determination that a list of models of its automotive wheel hub assemblies are outside the scope of the tapered roller bearings order. The Appellant, Power Train Components, Inc., appeared in the scope proceeding shortly thereafter as an interested party and importer of like merchandise. Appellee The Timken Company appeared in the proceeding as an interested party, and the primary domestic producer of affected merchandise.

Following its initial review of the matter, Commerce determined that a scope determination concerning certain of New Trend's wheel hub models, those without antilock braking system sensors, could be completed by reference to the descriptions of covered articles in the antidumping order's scope, the petition and the International Trade Commission's determinations. 19 C.F.R. § 351.225(k)(1). Commerce also determined that the scope description was not dispositive with reference to New Trend's wheel hub assemblies with antilock braking sensors, and proceeded to a determination for those products under the five Diversified Products factors, found at 19 C.F.R. section 351.225(k)(2).

After receiving submissions and rebuttals from the parties, Commerce issued its scope determination on April 18, 2011, finding all of New Trend's models of wheel hub assemblies within the scope of the antidumping order. Essentially Commerce determined that the products were housed tapered roller bearings, or wheel hub units, with some additional structures and functions that did not alter the essential function of the product, which was to act as a bearing.

Power Train appealed the decision to the U.S. Court of International Trade; New Trend chose not to participate. The court published its final

judgment on May 29, 2013, affirming Commerce's determination of the scope inquiry.  This appeal followed.

## STATEMENT OF FACTS

Plaintiff-Appellee, Power Train Components, Inc. ("Power Train" or "PTC") is an importer and distributor of automotive parts including automotive wheel hub assemblies with TRBs, similar to those imported by New Trend.  Commerce determined that several varieties of wheel hub assemblies with TRBs are within scope of the Order, originally promulgated in 1987.

## I.    Scope of the Antidumping Order

The scope description set forth in the Order is limited to tapered roller bearings and their parts, pre-assembled tapered roller bearings, and certain housed tapered roller bearings:

> Imports covered by the order are shipments of tapered roller bearings and parts thereof, finished and unfinished, from the PRC; flange, take-up, cartridge, and hanger units incorporating tapered roller bearings; and tapered roller housings (except pillow blocks) incorporating tapered rollers, with or without spindles, whether or not for automotive use. . . .

Tapered Roller Bearings and Parts Thereof, Finished or Unfinished, from the People's Republic of China, 76 Fed. Reg. 3,086, 3,087 (Jan. 19, 2011).

The International Trade Commission elaborated on the description of tapered roller bearings in its preliminary determination's product description:

> Tapered roller bearings are part of the larger category of antifriction bearings.  Antifriction bearings are machine components that permit free motion between moving and fixed parts by holding or guiding the moving parts to minimize friction and wear. . . . There are four basic components in a tapered roller bearing:  the cup, the cone, the cage, and the rollers. . . . The cage, rollers, and cone are joined together to form a cone assembly, which, when joined with a cup, forms a tapered roller bearing set.

Tapered Roller Bearings and Parts Thereof, and Certain Housings Incorporating Tapered Rollers from Hungary, Italy, Japan, The People's Republic of China, Romania and Yugoslavia:  Determinations of the Commission, USITC Publ. 1899 (1986), (JA 217-220[1]).  Power Train's expert, Dr. Shorya Awtar, echoed the ITC's definition of a bearing in his affidavit, stating that three functions "define() a bearing":  (i) allowing relative rotation between two machine parts; (ii) transmitting loads between two machine parts; (iii) and reducing friction from the relative rotation. Awtar Aff., (JA 343).

The ITC also explained pre-assembled TRBs, those whose four basic components are assembled, lubricated and sealed at the factory:

---

[1] Page references to the Joint Appendix are given at "JA" followed by the page numbers.

> Self-contained tapered roller bearing packages. – Also called bearing cartridge units and wheel hub units, these unitized bearings are prelubricated, preset, double-row tapered roller bearings that have been sealed. . . . Bearing cartridge units . . . are used almost exclusively in the United States on the front axle of front-wheel-drive cars.

Id. at JA 220-21.  The ITC thus defined "wheel hub units" as pre-assembled bearings, used almost exclusively on front axles.  In the ITC's final determination on TRBs from China, it described "wheel hub units" again as follows:

> [Like cartridge bearing units] [w]heel hub units are also prelubricated, preset, double-row tapered roller bearings that have been sealed; however, instead of a cup, the cone assemblies are sealed into a cast, flanged housing with bolt holes for direct mounting onto the wheel hub.  The flanged housing performs as the outer race of the bearing, taking the place of the typical tapered roller bearing cup. . . .

Id. at JA 245.

> Finally, the ITC defined "mounted bearing units":

> Mounted bearing units covered by this investigation are flange, cartridge, take-up and hanger assemblies.  These assemblies may incorporate ball bearings or tapered roller bearings.  None of the tapered roller bearing producers manufacture these units, and Timken was the only U.S. producer that reported making the bearings for such assemblies.

Id. at JA 221.

## II.    The Articles Subject to the Scope Request

New Trend filed the scope request at issue.  (JA 28-35)  In its submission, it defined the subject merchandise as follows:

This request covers wheel hub assemblies that New Trend exports from China and imports into the United States. As the name indicates, wheel hub assemblies are used with the front wheels of an automobile. Although, as discussed below, there are several different types of wheel hub assemblies, that are the subject of this scope request, all of them incorporate two non-removable tapered roller bearings in an inner race and cup that is machined into the unit's flange, and outer race machined into the assembly forging, and mounting studs for attachment of the assembly to an automobile.

The majority of the assemblies consist of a flanged outer hub with two tapered roller bearings, into which has been pressed a flanged spindle having a splined inner surface and mounting studs. These are referred to as "drive" units, as the splined inner surface of the spindle provides power transmission capability. Certain of the products do not have a splined spindle; these are called "driven" units, as they do not provide power transmission capability. Certain of the products include anti-lock braking system (ABS) capability, with an ABS connector emplaced between the bearings, a gear and an ABS sensor that provides information to the automobile's computer as to whether a wheel is turning; both drive and driven assemblies may have such ABS functionality.

Timken Scope Request, d. March 5, 2010 (JA 29). The covered products, which are aftermarket or replacement parts for vehicles, include many distinct models of wheel hub assemblies, because the assemblies are designed for use with specific manufacturers' cars and models. Generally, design requirements of particular car and truck models prevent them from being interchangeable with others

New Trend described its products further, distinguishing them from the bearings described in the Order:

The wheel hub assemblies are not tapered roller housings, because they provide functions that go beyond "protection and support" of the tapered roller bearings they contain. At the same time, the wheel hub assemblies provide functions that go beyond the antifriction or load-bearing capabilities of a tapered roller bearing. . . . Each of the wheel hub units also incorporates a brake pilot to align the brake rotor and a wheel pilot to align the wheel.

The splined assemblies ("drive units") are automotive power transmission components. Specifically, the splines in the hub mate with splines contained on the outer attaching end of the CV (constant velocity) drive axle . . . [which] provides the connection from the engine to the drive wheels and conveys power to move the automobile. . . . The ability to provide power transmission substantially advances the capability of the wheel hub unit beyond the attributes of the tapered roller bearings it incorporates. . . .

The wheel hub units with ABS capability are automotive braking components (for non-driven assemblies) or both automotive braking and power transmission components (for drive assemblies). They are essential for the automobile's ABS to operate properly. The attached sensor supplies wheel speed information to the ABS computer. Under braking, if wheel speeds are not equal, indicating wheel lockup, the computer modulates the anti-lock feature until the speeds are equal again. Whether alone or in combination with the transmission function, the ABS braking function provides a capability beyond the antifriction and load bearing attributes of a tapered roller bearing.

Driven, non-ABS wheel hub assemblies . . . have machined pilots for alignment with the wheel and brake rotor and studs for mounting . . . the brake rotor and wheel, features that make them automotive wheel components. . . . They are wheel components that are required for axle operation, a function beyond the protection and support role provided by a tapered roller housing.

Id. at JA 32-35.

New Trend's description of its wheel hub assemblies thus illustrated

the structures and functions its wheel hub assemblies provide that are

different from those of the products included in the Order's scope language, as explained by the ITC, while admitting the products also contain TRBs and perform bearing functions simultaneously.  It asserted that these different structures and functions distinguished the wheel hub assemblies from the TRBs and housed TRBs to which the scope is limited by its language.

In its submissions to Commerce, Power Train included the affidavit of Dr. Shorya Awtar, a mechanical engineering professor at the University of Michigan with a doctorate from M.I.T., with expertise in mechanical engineering and integrative engineering.  (JA 341-50)  Dr. Awtar painstakingly explained the structures and functions of a bearing, concluding that a bearing is *defined* by its function.  (JA 343)  After presenting the details of what one could reasonably consider to be a "bearing", Dr. Awtar discussed the various structures and functions of New Trend's products.  He confirmed New Trend's explanation of the splines' role in the transmission of power between the engine and the drive wheels; he also confirmed that the lugs on New Trend's assemblies transmit braking torque from the disc brake to the wheel, driven and undriven; and he described the ABS system as an electronic component, whose inclusion would make a wheel hub assembly an electromechanical device, rather than a mere mechanical device such as a bearing is.  (JA 348-50)

Dr Awtar explained:

The role or functionality of relaying either the drive or braking torque is entirely independent of the role, function, and structure of a bearing. . . . [T]he automotive wheel hub assembly incorporates design features other than those necessitated by its bearing function, that together provide additional functionality that is different from that of a bearing. This additional functionality is necessary to the vehicle's ability to move forward and backward, and to accelerate, slow and stop. These are not functions that a bearing, as it is generally understood, would provide. . . .

The structure and function of an ABS sensor bears no relationship to those of a bearing or housing. In fact, the incorporation of an ABS sensor into a wheel hub assembly renders the hub no longer a mere mechanical component, in my opinion. Rather, given the inclusion of both mechanical and electronic components and features, one would generally consider wheel hubs with ABS sensors to be electromechanical or mechatronic systems. In terms of mechanical design and engineering, it would be improper to refer to an automotive wheel hub which incorporates an ABS sensor as a bearing or housed bearing, even if it also incorporates these latter components. . . .

While it is clear that a wheel hub assembly incorporates a bearing assembly or a housed bearing, the latter is just one of many features of the former. An automotive wheel hub assembly is an assembly or system that incorporates multiple structures and multiple functions into a single whole. The whole is larger than any of its constituent parts, and thus as a matter of mechanical design and engineering would not be said to be any of its constituent parts. It neither a bearing, nor a bearing housing, nor a torque transmission unit, nor an ABS sensor. Rather, it is an integrated structure whose design incorporates multiple smaller structures and functions that are conceptually separate and distinct.

(JA 348-49)

Thus, Dr. Awtar showed convincingly that New Trend's wheel hub assemblies, taken as a whole, cannot be described accurately as bearings or housed bearings. They are integrated systems with multiple independent parts and multiple independent functions, each of which bears a critical importance to the operation of the wheel hub assembly as a whole, and of the vehicle in which the assembly is deployed.

### III.    Commerce's Analysis

Commerce bifurcated its analysis of the various styles of wheel hub assemblies New Trend presented. It determined that the hubs without ABS sensors, whether with splines or without, meet the description of the merchandise set forth in the Order's scope, interpreted with the aid of the ITC determination and the petition, pursuant to 19 CFR 351.225(k)(1). (JA 490) Commerce determined that the scope language was not dispositive with respect to the remaining wheel hub styles, those with ABS sensors, and proceeded to apply the Diversified Products criteria, pursuant to 19 CFR 351.225(k)(2). (JA490, et seq.) It concluded, ultimately, that these products also fell within the scope of the Order.

Throughout the analysis, Commerce used a concept of "essential function", defining the essential function of a TRB as reducing friction. (E.g., JA 489) First Commerce determined that the wheel hubs contained

11

the structures of bearings and reduced friction and it deemed that to be their essential function. Then, instead of examining the product as a whole as Dr. Awtar stated an engineer would do, Commerce looked at the non-bearing functions one by one and asked whether they altered the products' essential bearing function of friction reduction. In discussing non-ABS wheel hubs, Commerce wrote, "[w]heel hub units with additional features and functions retain the essential function of wheel hub units covered by the Order; that is, they continue to reduce friction. Thus, the additional features found on wheel hub units are engineering and design variations which do not alter the fundamental nature of the TRB." (JA 489)

In discussing New Trend's wheel hubs with ABS sensors, Commerce did the same thing. Commerce also focused on language in the ITC final determination, set forth in the staff's report of "information obtained in the Investigation". There, the ITC staff speculated that "the next generation of the self-contained units will have flanged inner and outer rings as part of the assembly. This will allow it to take over the functions of other, usually separate components in the wheel hub system." (JA 245) The ITC report did not indicate what functions it was referring to, nor did it state that it considered any such embellished wheel hub units to be necessarily within the scope of the Order. (Id.)

12

Citing the ITC staff's speculation on future products, Commerce stated "the ITC Report expressly addressed wheel hub units with additional functionality, indicating that such items would be the next generation of merchandise covered by the proceeding." (JA 489)  Commerce concluded New Trend's wheel hub assemblies with ABS elements are within the scope's physical characteristics because they contain the parts of TRBs and although "neither the Petition nor the ITC Report, nor the Order specifically addressed wheel hub units with ABS capability, the ITC Report expressly addressed wheel hub unites with additional functionality, indicating such items would be within the next generation of the merchandise covered by the investigation." (JA 491)

With respect to the second of the Diversified Products factors, the expectations of the products' purchasers, Commerce noted that "purchasers of wheel hub units, regardless of whether they contain ABS elements, would install them in an automobile," and "the ultimate purchasers expect that wheel hub units, with or without ABS elements, will function as part of a complete wheel hub bearing unit to reduce friction between moving parts." (JA 492)  Commerce did not analyze whether purchasers of hub units with ABS sensors would expect anything more of them than friction reduction, or

13

how important those other and additional expectations might be compared to the expectation of friction reduction.

In discussing the third factor, the ultimate use of wheel hub units with ABS elements, Commerce concluded that the use of New Trend's ABS-equipped assemblies were used to reduce friction. Without explaining why, Commerce wrote "We do not agree with PTC's contention that an ABS sensor, integrated permanently in many wheel hub assembly models, is an electronic device which changes the function of a wheel hub assembly. . . . While wheel hub units may have features which allow them to serve additional functions (in this case, the ABS sensor provides information to the automobile's computer to determine whether a wheel is turning), the wheel hub units retain their essential function of reducing friction and connecting the axle to the wheel." (JA 492) Commerce's determination that the addition of ABS sensors to a wheel hub does not alter its "essential function" thus was conclusory. (Id.)

The fourth factor is whether the products at issue are sold through the same channels as products within the scope. Commerce determined that wheel hub units with ABS sensors and those without are sold through the same channels of trade, namely automobile parts distributors. (JA 492-93)

The final factor is whether the products are advertised and displayed similarly to products covered by the Order. Commerce found, after examining advertising materials submitted by the parties, that wheel hub assemblies with ABS elements are advertised in the similarly regardless of their design features and elements. Advertising circulars contained models of wheel hubs both with and without ABS sensors. (JA 493-94)

Based on its discussion of these five factors, Commerce concluded that wheel hub units with ABS sensors are within the scope of the Order. (JA 494) Although New Trend and Power Train submitted responses to Commerce's preliminary determination, they did not cause Commerce to materially alter its analysis or conclusions. (JA 594-95)

## SUMMARY OF THE ARGUMENT

Commerce is required to apply the language of an antidumping order's scope description in determining whether particular articles are within the Order's scope, without expanding the scope. Moreover, Commerce must act based on substantial evidence in the record, without ignoring contrary evidence.

In this case, Commerce expanded the original scope of the antidumping order by including not only tapered roller bearings and housed tapered roller bearings, but also products that contain housed tapered roller

bearings, along with other, independent but equally important parts and functions.  Taken as a whole, however, New Trend's wheel hub assemblies cannot be said to be bearings or housed bearings.  Nonetheless, Commerce included these wheel hub assemblies in the scope of an order than describes only tapered roller bearings, their parts, and certain housed tapered roller bearings.

## ARGUMENT

### I.    Standard of Review

When reviewing a scope determination by Commerce, the Federal Circuit steps into the shoes of the Court of International Trade and applies the substantial evidence standard of review.  Walgreen Co. of Deerfield, IL v. United States, 620 F. 3d 1350, 1354 (Fed. Cir. 2010).  The governing statute requires a determination of whether the scope determination is "supported by substantial evidence in the record or otherwise not in accordance with law."  19 U.S.C. § 1561a(b)(1)(B)(i).  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Consol. Edison v. NLRB, 305 U.S. 197, 229, 59 S.Ct. 206 (1938).  If it is to satisfy this standard, Commerce cannot "fail() to take into account record evidence that weighs against the conclusion it

reached, \*\*\* and the breadth of the record evidence." <u>Legacy Classic Furniture, Inc.</u>, 807 F. Supp. 2d 1353, 1358, 1361 (C.I.T. 2011).

## II.   Commerce's Determination Improperly Expanded the Scope

The scope of the Order, by its own terms, covers tapered roller bearings, parts of tapered roller bearings, and certain housings containing tapered roller bearings.  (JA 582)  It mentions no other products, functions or structures.  The effect of Commerce's determination in this case is to expand the scope to include products that are not tapered roller bearings, parts or housings, merely because they include tapered roller bearings and a housing.

In interpreting the scope of an antidumping order, Commerce may refer to ancillary documents to help define terms as it did here, including "descriptions of the merchandise contained in the petition, the initial investigation and the determinations of the Secretary [of Commerce] . . . and the [International Trade] Commission."  19 C.F.R. § 351.225(k)(1).  In doing so, however, Commerce cannot expand the scope of an antidumping order or interpret it contrary to its terms, even if the petition or the ITC investigation contains broader product definitions.  <u>Duferco Steel Inc. v. United States</u>, 296 F. 3d 1087, 1095 (Fed. Cir. 2001).  The deciding question is whether the final scope order included the subject merchandise.  <u>Id.</u> at 1096.  Although the language of the scope may be *clarified* by reference to

17

the additional documents, the reference may not expand it beyond its original terms. Id. at 1097.

When it was developing its understanding of the scope language, Commerce permissibly referred to language in the ITC determinations. (JA 486, 488) First, Commerce looked to the ITC's definition of wheel hub units for additional detail, and the ITC was specific: "prelubricated, preset, double-row tapered roller bearings that have been sealed; however instead of a cup, the cone assemblies are sealed into a cast, flanged, housing with bolt holes for direct mounting onto the wheel hub." (JA 486) This describes a type of housed bearing and is fully within the scope description set forth in the Order.

The problem is that in this case, New Trend's wheel hub assemblies differ materially from the ITC's description in that they have both physical structures and resulting functions that are not described by the scope or by the ITC's discussion. As Dr. Awtar ably explained, the lugs that seat the disc brake rotor, and transfer braking torque through the hub to the wheel in all of New Trend's wheel hub models, cannot be described as a "bearing" in structure or function. (JA 348) "The splined aperture, present in the drive hubs, that seats the drive shaft and transfer drive torque through the hub to the wheel cannot be described as a bearing in structure or function." (Id.)

18

Similarly, the ABS sensor, which creates an electric current as the wheel turns, that is fed to the vehicle's onboard computer, cannot be described as a bearing in structure or function.  (JA 349)

Thus, if you take New Trend's products as entire structures, you cannot describe them as TRBs or housed TRBs, although they contain these structures and, in part, have their functions.  (JA 348-49)  Therefore, they are not included in the language of the Order's scope.  The scope says nothing about lugs, splines, and sensors; and nothing about braking, power train functions, torque transmission or wheel speed sensing.  Products that do these things perforce cannot be within this particular scope.

The mistake Commerce made was to take obiter dictum in the ITC staff's investigation results and arbitrarily add it to the scope.  Commerce quoted the ITC staff saying "the next generation of these types of the self-contained units will have flanged inner and outer rings as part of the assembly . . .  allow[ing] it to take over the function of other usually separate components in the wheel hub system."  (JA 486)  Commerce used this language to gloss over the contrary record evidence that New Trend's wheel hubs do not fit within the scope description.  "The ITC expressly addressed wheel hub units with additional functionality," wrote Commerce, "indicating

that such items would be the next generation of merchandise *covered by the proceeding*." (JA 489) (emphasis added.)

There is no indication in the ITC's determination, however, that the ITC intended this speculation about future engineering designs to describe merchandise covered by the Order. For example, the Language is not included in the ITC's own iteration of the scope language. (JA 485) It was not adopted by Commerce at the time the Order issued. Indeed, it could not have been, because the ITC did not express any knowledge of what form the additional functionality would take and what effect it would have on the products that might incorporate it.

The effect of adopting the ITC's language concerning prospective, potential evolutions of housed TRBs was to cause Commerce to include within the Order's coverage products that cannot reasonably be described by the terms set forth in the scope. The integrated automotive part fairly described by Dr. Awtar as "neither a bearing, nor a bearing housing, nor a torque transmission unit, nor an ABS sensor," simply cannot be described as a "housed bearing" within the scope. (JA 349)

New Trend's wheel hubs are an amalgam of these things, an integrated system of multiple constituents whose descriptors are nowhere in the scope language. Including them in the Order's scope impermissibly

20

expands that scope to include automotive parts that are not bearings, that perform functions that are not bearing-related, and that are not identified in the Order and in the reasonable definition of terms found in the Order, simply because they also contain a bearing.

## III. Commerce's Application of an "Essential Function" Test Is Arbitrary and Unreasonable.

Throughout its comparisons of products described by the scope language and New Trend's products, Commerce used a truncated analysis that assumed the product is a bearing whose essential function is friction reduction. Commerce then questioned whether other structures and functions included in New Trend's products somehow mitigated or replaced those of the housed bearing components. If the housed bearing, with the new structure and function added, continued to contain the components of a bearing and to reduce friction, then the inquiry ended and Commerce declared the product a bearing and within the scope

While it may be fair to say that the essential function of a bearing is to reduce friction from rotational motion, it is not fair to say the same about one of New Trend's wheel hub assemblies, taken as a whole. These products are different because they have multiple structures and functions that stand and operate side by side, integrated into the end product, all of

which are essential.  Ignoring that led Commerce to unreasonable conclusions.

For example, consider a drive hub without an ABS sensor.  It contains structures, unrelated to the bearing it also contains, which communicate braking torque from the disc brake to the wheel and power torque from the drive shaft to and from the wheel.  Without the lugs that hold the disc brake rotor and transmit braking torque, the brake system would not be able to slow or stop the wheels.  And without the spline, the drive shaft would not be able to transfer its motion to the drive wheel, and the car would not be able to accelerate, or decelerate using engine drag.  If one analyzes the part as a whole it is manifest that the components that cause the car to stop and go must be essential.  Without them the car cannot function as self-propelled transportation, its primary – even sole – use.  It is beyond unreasonable to decide that friction reduction is the essential function of such a part to the exclusion of making the car stop and go.  Yet that is exactly what Commerce did.  (JA 488-489)

The non-drive hubs without ABS sensors are subject to a similar analysis.  Even without a spline, they have the lug structures that serve as necessary parts of braking system, without which the vehicle's brakes would not work.  Again, it would be unreasonable to conclude that friction

reduction is the essential function of the integrated product and braking function is not. Without the braking function, the car would be undrivable.

The hubs with ABS sensors, analyzed by Commerce with the Diversified factors, are subject to similarly unreasonable analyses. In examining the physical characteristics of these models, Commerce ignored the power train and braking elements and looked only at the bearing and ABS elements. After noting that the wheel hub assemblies "incorporate the cup, cone, cage and rollers associated with TRBs" and the structure of a TRB housing, Commerce concluded that addition of an ABS sensor "does not alter the fundamental physical nature of the wheel hub unit." (JA 491)

This conclusion did not take full account of Dr. Awtar's explanation that the addition of the ABS sensor changed the entire hub assembly from a mechanical structure to an electromechanical system. (JA 349) Moreover, the structures and functions of the wheel hub unit selected by Commerce as a basis for decision are now only one among three or four sets of structures and functions vital to the hub's and the vehicle's operation. It is arbitrary unreasonable to exclude these other elements, the ones that make the car stop and go, from the analysis.

The analysis of expectations of ultimate purchasers was similarly truncated. As the Court explained, Commerce "posited that 'purchasers of

wheel hub units regardless of whether they contain ABS elements, would

install them in an automobile."  (JA 16)  The Court went on to say:

> While recognizing that the expectations of the ultimate purchasers of
> wheel hub assemblies with ABS elements may exceed the baseline
> expectations of the ultimate purchaser of mere wheel hub units, the
> Court cannot say a reasonable mind would not as adequate
> Commerce's determination that the ultimate purchaser's expectations,
> regardless of any bonus features, is to purchase a product that reduces
> friction between moving parts.

(JA 17)  Here, the Court is too deferential.  Commerce's determination is

inherently arbitrary and unreasonable.

A person buying a wheel hub assembly with an ABS sensor to be

installed on his vehicle, must expect that all of the functions we have

discussed here would operate completely and reliably.  After all, he would

expect that his car would be able to accelerate, and to slow and stop, no less

than be able to move with a minimum of friction.   And if he bought a hub

unit with an ABS sensor, he would expect it to allow his on-board safety

systems to function fully.  A reasonable car owner would expect, indeed

need, all of these elements of the hub to operate.  It is arbitrary to pick one

such essential function and place it above the others.

In discussing Commerce's analysis of the ultimate use of the product,

the third of the Diversified factors, the Court noted that Commerce admitted

that the ABS sensor "serves an additional purpose".  (JA 17)  Nonetheless,

Commerce noted that the addition "'does not replace the original fundamental use of the wheel hub units . . . ." (<u>Id.</u>)  The Court found Commerce's determination that wheel hub units with ABS sensors have the ultimate use of reducing friction, was "supported by record evidence." (<u>Id.</u>)

Again, the arbitrariness of this determination is manifest upon examination of the entire wheel hub and consideration of its use.  While it is true that friction reduction is one of the uses of New Trend's wheel hub assemblies with ABS, each of the other uses is equally important to the functioning of the vehicle and therefor to the functioning of the wheel hub once affixed to the vehicle.  Stopping, starting, slowing, and avoiding unsafe braking problems are every bit as important in the deployment of a wheel hub assembly as friction reduction.  Commerce was arbitrary and unreasonable in selecting friction reduction as the ultimate use, and the Court was overly deferential in affirming it.

The last two of the <u>Diversified</u> factors are less material in this case. The wheel hub assemblies at issue are as much automotive parts as the original wheel hubs referenced in the investigations of 1986 and 1987.  They are designed to be used with different vehicles, but with vehicles nonetheless.  Consequently, both are sold through parts distributors, the primary channel for auto parts, and both are advertised in the same types of

catalogs, and displayed similarly in auto parts dealerships, albeit with different features. The similarities in these two factors are not particularly informative in this case.

In conclusion, Commerce applied the most relevant factors without taking reasonable account of the relevant, contrary evidence in the record of other equally important structures and functions. Had it taken reasonable account of the contrary evidence of these other structures and functions, it would have found New Trend's products to be distinguished from the merchandise described in the Order's scope. Therefore, Commerce's determination should be reversed, as should the CIT's affirmance of it.

## <u>CONCLUSION AND PRAYER FOR RELIEF</u>

For the reasons set forth above, the Court should reverse the judgment

of the CIT, and hold that Commerce's scope determination was not

supported by substantial evidence in the record, or otherwise not in

accordance with law.

Respectfully submitted,

/s/Robert M. Klingon
Robert M. Klingon
The Klingon Law Firm
Attorney for Appellant,
  Power Train Components, Inc.
444 East 82 Street, 14th Fl.
New York, NY 10028
(917) 309-6698
robertklingon@gmail.com

# ADDENDUM

Slip Op. 13-67

## UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| **POWER TRAIN COMPONENTS, INC.,** | |
| Plaintiff, | |
| v. | **Before: Gregory W. Carman, Judge** |
| **UNITED STATES,** | **Court No. 11-00153** |
| Defendant, | |
| and | |
| **THE TIMKEN COMPANY,** | |
| Defendant-Intervenor. | |

### OPINION & ORDER

[Commerce's *Final Scope Ruling* is sustained.]

Dated: May 29, 2013

*Robert M . Klingon,* The Klingon Law Firm, of New York, NY, for Plaintiff.

*L. Misha Preheim,* Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, of Washington, DC, for Defendant, and *Nathaniel J. Halvorson,* Attorney, Office of the Chief Counsel for Import Administration, United States Department of Commerce, of counsel.  With them on the briefs were *Tony West,* Assistant Attorney General, *Jeanne E. Davidson,* Director, *Patricia M. McCarthy,* Assistant Director.

*Terence P. Stewart, William A. Fennell,* and *Stephanie R. Manaker,* Stewart and Stewart, of Washington, DC, for Defendant-Intervenor.

A-1

Court No. 11-00153                                                    **Page 2**

     CARMAN, JUDGE: Plaintiff Power Train Components, Inc. ("Plaintiff" or "PTC")

contests the scope ruling by the United States Department of Commerce ("Commerce")

that its wheel hub assemblies are within the scope in the antidumping duty order

covering tapered roller bearings ("TRBs") from the People's Republic of China

("China"). *Tapered Roller Bearings from the People's Republic of China: Final Scope Ruling on*

*New Trend Engineering Ltd.'s Wheel Hub Assemblies, Memorandum from Wendy Frankel,*

*Director, Office 8, to Gary Taverman, Acting Deputy Assistant Secretary for Antidumping and*

*Countervailing Duty Operations* (Apr. 18, 2011) ("*Final Scope Ruling*"), A/R[1] 48; *Tapered*

*Roller Bearings and Parts Thereof, Finished or Unfinished, From the People's Republic of China,*

52 Fed. Reg. 22,667 (June 15, 1987) ("*TRB Order*"). Pursuant to Plaintiff's motion for

judgment on the agency record, the Court sustains Commerce's *Final Scope Ruling*.

BACKGROUND

     The antidumping duty order scope covers tapered roller bearings from China.

*See TRB Order*, 52 Fed. Reg. at 22,667. The current scope description, as of the last

administrative review, is:

> [i]mports covered by the order are shipments of tapered roller
> bearings and parts thereof, finished and unfinished, from the PRC;
> flange, take up cartridge, and hanger units incorporating tapered
> roller bearings; and tapered roller housings (except pillow blocks)

---

    [1] A/R refers to Administrative Record.

A-2

Court No. 11-00153                                                    Page 3

      incorporating tapered rollers, with or without spindles, whether or
not for automotive use. These products are currently classifiable
under Harmonized Tariff Schedule of the United States ("HTSUS")
item numbers 8482.20.00, 8482.91.00.50, 8482.99.15, 8482.99.45,
8483.20.40, 8483.20.80, 8483.30.80, 8483.90.20, 8483.90.30, 8483.90.80,
8708.99.80.15 and 8708.99.80.80. Although the HTSUS item numbers
are provided for convenience and customs purposes, the written
description of the scope of the order is dispositive.

*Tapered Roller Bearings and Parts Thereof, Finished or Unfinished, from the People's Republic*

*of China*, 76 Fed. Reg. 3,086, 3,087 (Jan. 19, 2011) ("*Final Results*").[2]

      On March 5, 2010, New Trend Engineering Ltd. ("New Trend") submitted a

request for a scope determination that its imports of certain wheel hub assemblies from

China are outside the scope of the TRB Order.  *See New Trend Scope Request* (Mar. 5,

2010) ("*Scope Request*"), A/R 1.  Defendant-Intervenor The Timken Company ("Timken")

opposed the scope request as the petitioner in the original antidumping investigation.

*See* Def.-Int. the Timken Company's Opp'n to the Mot. for J. on the Agency R. of Pl.

Power Train Components, Inc. ("Def.-Int.'s Opp'n") at 6, ECF No. 34.  On June 15, 2010,

Commerce issued a notice stating that it would open a scope inquiry pursuant to 19

C.F.R. § 351.225(e).  Def.'s Opp'n to Pl.'s Mot. for J. upon the Agency R. ("Def.'s Opp'n")

---

    [2] In the *Final Results*, there was a different scope determination discussed
regarding a company called New Torch and its wheel hub units. In contrast to this
determination, Commerce found that New Torch's wheel hub units were outside the
scope of the order because they do not contain TRBs. *Final Results*,  76 Fed. Reg. at 3,087.

Court No. 11-00153                                                                Page 4

at 5, ECF No. 36 (citing *Notice of Initiation of Scope Inquiry* (June 15, 2010) ("*Scope Initiation*"), A/R 8).  On July 14, 2010, Plaintiff submitted its notice of appearance as an interested party and importer of like merchandise.  Brief of Pl. Power Train Components, Inc. in Supp. of Its Mot. for J. on the Agency R. ("Pl.'s Mot.") at 4, ECF No. 28 (referencing PTC Comments to Scope Inquiry)( July 14, 2010), A/R 15).[3]

> New Trend's wheel hub assemblies include "several varieties of generation three wheel hub assemblies that incorporate [tapered roller bearings ('TRBs')]" which "are designed for front wheel use." *Id*. at 5 (internal citations omitted).  All the wheel hub assemblies

> > incorporat[e] two non-removable tapered roller bearings in an inner race and cup that is machined into the unit's flange, an outer race machined into the assembly forging, and mounting studs for attachment of the assembly to an automobile.  The two machined bearing races are characteristic of products known in the industry as generation three wheel hub assemblies.  The generation three wheel hub assemblies subject to the request including [sic] front wheel models both with a splined spindle and without; and both with antilock braking ("ABS") sensors and without.

*Id*. at 3 (internal citations omitted).

> Commerce divided the subject wheel hub assemblies into two groups—with and without ABS sensors—and analyzed each group individually.  Commerce

---

[3] After New Trend submitted its scope request, PTC filed its own scope request for a substantially similar product, but Commerce merged PTC's request into New Trend's scope proceeding. *See* Def.'s Opp'n at 4.

Court No. 11-00153                                                                    Page 5

determined that wheel hub assemblies without ABS elements are within the scope

pursuant to 19 C.F.R. § 351.225(k)(1) ("(k)(1) Factors"),[4] meeting the "description of

wheel hub *units* and tapered roller housings included in the scope of the Petition, the

ITC Report, and the Order." *Id.* at 4 (citing *Tapered Roller Bearings from the People's*

*Republic of China: Preliminary Scope Ruling on New Trend Engineering Ltd.'s Wheel Hub*

*Assemblies*, Memorandum from Wendy Frankel, Director Office 8, to Christian Marsh, Deputy

*Assistant Secretary for Antidumping and Countervailing Duty Operations* at 12 (Dec. 18,

2010) ("*Preliminary Scope Ruling*"), A/R 30).  Commerce noted that the International

Trade Commission ("ITC" or "Commission") specifically identified "wheel hub units,"

which are the same as wheel hub assemblies,[5] as part of the scope.  Def.'s Opp'n at 3

(citing *Tapered Roller Bearings and Parts Thereof, and Certain Housings Incorporating Tapered*

-----

[4] When considering whether a particular product is included within the scope of
an order, first the (k)(1) Factors are considered, and if they are found to be dispositive,
the inquiry is complete.  The (k)(1) Factors are:

> The descriptions of the merchandise contained in the petition, the
> initial investigation, and the determinations of the Secretary [of the
> Department of Commerce] (including prior scope determinations) and
> the [International Trade] Commission.

19 C.F.R. § 351.225(k)(1).

[5] The terms "units" and "assemblies" are used interchangeably within the
industry, and Commerce highlighted that "New Trend itself has used the terms
interchangeably during the scope proceeding."  *Preliminary Scope Ruling* at 6; *see* Def.-
Int.'s Opp'n at 6, n.3.

Court No. 11-00153                                              Page 6

*Rollers from Hungary, the People's Republic of China, and Romania, USCIT Publ. 1983, Inv.*

*Nos. 731-TA-341, 344, and 345 (final)* at A-6 (June 1987) ("*ITC Report*"), A/R 4, Attach. 2.)

Commerce then determined that wheel hub assemblies with ABS elements are within

the scope pursuant to 19 C.F.R. § 351.225(k)(2) ("(k)(2) Factors").[6] Pl.'s Mot. at 4.

   Plaintiff challenges Commerce's scope determinations and explains that the

wheel hub assemblies "are not mere tapered roller housings, or tapered roller housed

bearings," but "they also incorporate enough additional structures and functions that

they do not *constitute* tapered roller housings or housed bearings" thereby removing

them from the TRB scope. *Id.* at 12 (citations omitted) (emphasis in original).

   Defendant-Intervenor Timken, who was petitioner in the underlying

investigation, supports Commerce's scope determinations, advancing the argument that

it listed wheel hub assemblies as "part of the scope" in its underlying petition. Def.-

Int.'s Opp'n at 4 (citing *Antidumping Duty Petition: Tapered Roller Bearings, Rollers and*

---

[6] When considering whether a particular product is included within the scope of
an order, if the (k)(1) Factors are not dispositive, then the (k)(2) Factors are considered:

   (2) When the above criteria are not dispositive, the Secretary will further
   consider:
   (i) The physical characteristics of the product;
   (ii) The expectations of the ultimate purchasers;
   (iii) The ultimate use of the product;
   (iv) The channels of trade in which the product is sold; and
   (v) The manner in which the product is advertised and displayed.

19 C.F.R. § 351.225(k)(2).

Court No. 11-00153                                                           **Page 7**

*Other Parts from Japan, Italy, Yugoslavia, Romania, Hungary, The People's Republic of China*

at 9-10 (Aug. 25, 1986) ("*Petition*"), A/R 4, Attach. 1).

STANDARD OF REVIEW

The Court has jurisdiction pursuant to 28 U.S.C. § 1581(c) (2006).  For scope

determinations, the Court sustains determinations, findings or conclusions of

Commerce unless they are "unsupported by substantial evidence on the record, or

otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i).  The possibility of

drawing two inconsistent conclusions from the evidence does not prevent Commerce's

finding from being supported by substantial evidence.  *Consolo v. Fed. Marit. Comm'n*,

383 U.S. 607, 620 (1966).  "Substantial evidence" means "such relevant evidence as a

reasonable mind might accept as adequate to support a conclusion." *Consol. Edison v.*

*NLRB*, 305 U.S. 197, 229 (1938).

DISCUSSION

It is well-established that the cornerstone in any scope determination is the

language of the order itself.  *Walgreen Co. of Deerfield, IL v. United States*, 620 F.3d 1350,

1357 (Fed. Cir. 2010) (citing *Duferco Steel, Inc. v. United States*, 296 F.3d 1087, 1097 (Fed.

Cir. 2002)).  Commerce may not impermissibly expand the scope of the order.  *Id.* at

1354.  Issues regarding scope arise because "the descriptions of subject merchandise

contained in [Commerce's] determinations must be written in general terms." 19 C.F.R.

A-7

Court No. 11-00153                                                                  **Page 8**

§ 351.225(a).  Accordingly, scope inclusions are written in broad terms and then specific

exclusions are carved out from the general terms.  Some exclusions are qualified and

some are not.

    In considering whether a particular product is within the scope of an order,

Commerce will take into account the descriptions of the merchandise contained in the

petition, the investigation, and the determinations of Commerce and the ITC.  *Final

Scope Ruling* at 3 (citing 19 C.F.R. § 351.225(k)(1)).  If it determines that these

descriptions are dispositive, then Commerce will issue a final scope ruling.  *Id.* But if

the descriptions are not dispositive, then Commerce will consider the factors set forth in

19 C.F.R. § 351.225(k)(2).  *Id.* (citing 19 C.F.R. § 351.225(e)).

I.       **Administrative Review**

    Commerce noted that "the scope's language in the [TRB] Order (i.e., tapered

roller housings with spindles for automotive use) is broad and includes multiple

products that have varied applications."  *Final Scope Ruling* at 7; *see Petition* at 10 ("In all,

there are over 160 types in approximately 26,000 bearing combinations. . . . This petition

covers all types of TRBs (including self-contained bearing packages).").  While

admitting that "the scope [language] does not explicitly list 'wheel hub assemblies,'"

Commerce found "that New Trend's wheel hub assemblies without ABS elements are

tapered roller housings in that the outer flange is a flanged housing that incorporates

A-8

Court No. 11-00153                                                                                    Page 9

TRBs," which are covered by the scope of the TRB Order. *Final Scope Ruling* at 5. In

contrast, while admitting that the subject products "*incorporate* tapered roller housings

and housed bearings," Plaintiff asserted that its wheel hub assemblies "also incorporate

enough additional structures and functions that they do not *constitute* tapered roller

housings or housed bearings." Pl.'s Mot. at 12 (emphasis in original) (internal citations

omitted). Commerce considered Plaintiff's argument and determined that

> wheel hub units with additional features and functions retain the
> essential function of wheel hub units covered by the Order; that is,
> they continue to reduce friction. Thus, the additional features found
> on wheel hub units are engineering and design variations which do
> not alter the fundamental nature of the subject TRB.

*Preliminary Scope Ruling* at 7.

New Trend's scope inquiry involved various subject wheel hub assemblies, but

Commerce divided the subject wheel hub assemblies into two categories for scope

determination purposes. New Trend's wheel hub assemblies are described as follows:

> Although there are several different types of wheel hub assemblies
> that are subject to this scope request, all of them incorporate two non-
> removable TRBs in an inner race and cup that are machined into the
> unit's flange, an outer race machined into the assembly forging, wheel
> and brake "pilots" for aligning the wheels and brake rotors, and
> mounting wheel studs. The majority of the assemblies consist of a
> flanged outer hub with two TRBs, into which has been pressed a
> flanged spindle having a splined inner surface and mounting studs.
> The wheel hub assemblies are "sealed for life," "greased at factory,"
> and "the bearing preload is set at factory." . . . Certain of the products
> do not have a splined spindle and certain of the products include ABS
> capability. New Trend's wheel hub assemblies may be categorized

Court No. 11-00153                                                          **Page 10**

> into the following types of merchandise: (1) splined and non-splined
> without ABS elements and (2) splined and non-splined with ABS
> elements.

*Final Scope Ruling* at 4 (internal citations omitted).  Accordingly, given the broad

language of the scope and the apparently indiscernible characteristics of TRB

incorporation into the subject product, Commerce initiated a formal scope inquiry

pursuant to 19 C.F.R. § 351.225(e) and received comments from New Trend, Plaintiff

and Defendant-Intervenor.  *See* Def.'s Opp'n at 5.  Because there is no objection to

Commerce's division of the subject products, the Court's review will follow

Commerce's trajectory, first looking at wheel hub assemblies without ABS under the

ambit of the (k)(1) Factors, and then looking at the wheel hub assemblies with ABS

under the ambit of the (k)(2) Factors, checking for support on the record for

Commerce's scope determinations.

  II.    **Administrative Determinations**

      A.    *Wheel Hub Assemblies without ABS Pursuant to the (k)(1) Factors*

          Commerce determined that wheel hub assemblies without ABS are included in

scope based upon the language of the petition and the ITC Report pursuant to the (k)(1)

Factors.  Commerce found that "New Trend's wheel hub units without ABS elements

meet the physical description of subject merchandise as *explicitly* stated in the Order"

because "New Trend's wheel hub assemblies without ABS elements are essentially

Court No. 11-00153                                              Page 11

tapered roller housings with spindles." *Preliminary Scope Ruling* at 8 (emphasis in

original); *see Final Scope Ruling* at 5.

      To sustain a (k)(1) determination, the Court reviews the record for support that

Commerce's determination that wheel hub assemblies without ABS elements are in-

scope. The petition was filed by Defendant-Intervenor, Timken. To illustrate its desired

scope description, Timken attached advertisement sheets to its petition, which included

depictions of wheel hub units identified as being "part of the scope of this petition."

Def.-Int. Opp'n at 4 (citing *Petition* at 10). Commerce also considered the ITC Report,

which specifically stated that "wheel hub units are a type of tapered roller housing."

*Final Scope Ruling* at 6, 9. Commerce reasoned:

> The ITC specifically identified wheel hub units as one category of in-
> scope products and described them as "self-contained tapered roller
> bearing packages." According to the ITC, these "self-contained
> tapered roller bearing packages include cartridge bearing units and
> wheel hub units" and "the next generation of the self-contained units
> will have flanged inner and outer rings as part of the assembly."

*Final Scope Ruling* at 7 (citing *ITC Report* at A-6). The "next generation of the self-

contained units" that "have flanged inner and outer rings as part of the assembly" as

referenced by the ITC describes the wheel hub assemblies imported by New Trend,

which are considered third generation. *Final Scope Ruling* at 7. Because the "next

generation of wheel hub units with their flanged inner and outer rings as part of the

assembly" are still "a type of self-contained tapered roller bearing package, subject to

Court No. 11-00153                                                    Page 12

the scope," Commerce determined that the ITC Report supported a finding that wheel

hub units are within the scope of the TRB Order. *Id.*  Upon review of the record, the

Court finds that Commerce's determination that wheel hub assemblies without ABS are

within the scope based upon a review of TRB Order, petition and ITC Report—the (k)(1)

Factors—is supported by the record and otherwise in accordance with law.

Regarding Plaintiff's argument that the subject product falls under a different

HTSUS than those listed in the scope, the Court notes that the language of the scope

expressly states "[a]lthough the HTSUS item numbers are provided for convenience

and customs purposes, the written description of the scope of the order is dispositive,"

*Final Results*, 76 Fed. Reg. at 3,087, and agrees with Commerce that "HTSUS items

numbers do not define the scope, rather the scope's written description is dispositive of

its coverage," *Final Scope Ruling* at 15. *See also Novosteel SA v. United States*, 284 F.3d

1261, 1270 (Fed. Cir. 2002) ("[o]ur precedent has . . . indicated, meanwhile, that a

reference to an HTSUS number is not dispositive about the scope of an antidumping or

countervailing-duty order") (internal citations omitted).

> **B.**     *Wheel Hub Assemblies with ABS Pursuant to the (k)(2) Factors*

An ABS sensor is "an electronic component that generates a small electric

signal that indicates the speed of revolution of each respective wheel."  Pl.'s Mot. at 17

(citing Awtar Aff. ¶ 11, A/R 15, Ex. B).  Plaintiff asserts that "incorporating the ABS

Court No. 11-00153                                                        **Page 13**

sensor into the wheel hub . . . changes the essential character of the wheel hub." *Id.* at

17.  Plaintiff argues that Commerce should have found the subject wheel hub assemblies

with ABS elements out of scope pursuant to the (k)(1) Factors and should have never

"resorted to" the (k)2 Factors. *Id.*  Defendant-Intervenor points out, however, that the

scope descriptions do not include "any language that limits scope to mechanical

'systems' or that excludes electromechanical 'systems' . . . . so there is no factual basis in

the record for [Commerce] to distinguish between products based on this criterion."

Def.-Int.'s Opp'n at 17.

        Commerce acknowledges "ambiguity" over ABS elements, Def.'s Opp'n at 6,

because they were neither  "expressly covered by the Order" nor "discussed in the ITC

Report," *Preliminary Scope Ruling* at 8.  Accordingly, Commerce decided that the (k)(1)

Factors do "not unambiguously address the ABS component of Power Train's

merchandise."  Def.'s Opp'n at 16.  Because the (k)(1) Factors are not dispositive for

wheel hub assemblies with ABS elements, Commerce resorted to the criteria set forth in

19 C.F.R. § 351.225(k)(2).

        In reviewing a scope ruling, a court must grant "significant deference to

Commerce' own interpretation of those orders," *Duferco Steel*, 296 F.3d at 1094-95,

because "Commerce's discretion [is] at the very heart of its expertise," *Walgreen Co.*, 620

F.3d at 1355.  With this in mind, the Court cannot say that Commerce' decision to

Court No. 11-00153                                                        Page 14

conduct a further, more in-depth analysis regarding a product's character and function

is unreasonable.  The Court reviews Commerce's analyses of each of the (k)(2) Factors

for wheel hub assemblies with ABS elements for substantial evidence on the record.

Plaintiff relies on *Legacy Classic Furniture, Inc. v. United States*, 807 F. Supp. 2d

1353, 35 CIT ___ (2011) in support of its challenge.  *See* Pl.'s Reply Br. at 3, ECF No. 42.

That scope case is distinguishable because its subject product—the Heritage Court

Bench— fit ambiguously in the scope description of the order and unambiguously in a

listed exclusion.  In the instant case, there is no exclusion for wheel hub assemblies, with

or without ABS elements.  This case is more akin to *Color Television Receivers from*

*Taiwan: Notice of Final Scope Ruling Couch Master International Corporation*, where the

subject merchandise was "neither specifically included . . . nor excluded," and

subsequently Commerce determined that "additional features that do not change the

primary nature of an 'in-scope' product do not serve to move that product outside of

the scope order."  63 Fed. Reg. 805, 806 (Jan. 7, 1998).

## 1.      Physical Characteristics of the Product

Regarding the factor of physical characteristics of the product, Commerce

concluded that

> [r]ecord evidence demonstrates that New Trend's wheel hub
> assemblies with ABS elements share the same physical characteristics
> as TRBs covered by the Order.  Specifically, all of New Trend's wheel
> hub assemblies incorporate the cup, cone, cage, and rollers associated

Court No. 11-00153                                                    Page 15

> with TRBs. . . . Additionally, record evidence demonstrates that New
> Trend's wheel hub assemblies with ABS elements share the same
> physical characteristics of tapered roller housings (considered TRBs
> under the scope of the Order) because all of them incorporate two
> non-removable tapered roller bearings that are sealed into a cast,
> flanged housing, taking the place of the typical tapered roller bearing
> cup. The flange houses the TRBs to reduce friction.

*Preliminary Scope Ruling* at 9; *see* Def.'s Opp'n at 18-20.  Plaintiff argues that the addition

of the ABS sensor changes the fundamentals of this product removing it from the scope,

but Commerce found the ABS sensor "to be an additional design and engineering

element of the wheel hub unit that enhances the product's functionality but does not

alter the fundamental physical nature of the wheel hub unit as described above."

*Preliminary Scope Ruling* at 9. Commerce determined that "the mere addition of a sensor

does not take an otherwise subject product out of the scope of the order." Def.'s Opp'n

at 19-20.

　　　The Court agrees with Commerce that the essential physical characteristics of

in-scope TRBs and wheel hub assemblies with ABS elements—the cup, cone, cage and

rollers—are the same.  The Court notes that an electronic sensor imparts an additional

physical characteristic to wheel hub assemblies with ABS, which is not shared by non-

ABS wheel hub assemblies.  While the contrary conclusion—that an electronic

component does indeed change the physical characteristic of a product—could have

been drawn, the Court is mindful of its standard of review and cannot say a reasonable

mind would not accept as adequate Commerce's determination that the addition of a

Court No. 11-00153                                                           Page 16

sensor does not take an otherwise subject product out of the order.  The Court therefore

sustains Commerce as to the physical characteristics of the wheel hub assemblies with

ABS sensors.

### 2.       Expectations of the Ultimate Purchasers

Regarding the factor of customer expectations of the product, Commerce

reasoned that "TRBs are designed and sized for specific applications in a variety of

products and industries, including both industrial applications and automotive

equipment. . . . [T]he ultimate purchasers expect that wheel hub units, with or without

ABS elements, will function as part of a complete wheel hub bearing unit to reduce

friction between moving parts." *Preliminary Scope Ruling* at 10 (citing *Petition* at 8-9; *ITC

Report* at 5).  According to the ITC Report, the US market for TRBs has historically been

the automotive market, with 85% of all TRBs sold to original equipment manufacturers

("OEMs"), and the remainder going to the aftermarket.  *Preliminary Scope Ruling* at 10-

11 (citing *ITC Report* at A-24).  Commerce posited that "purchasers of wheel hub units,

regardless of whether they contain ABS elements, would install them in an automobile."

*Preliminary Scope Ruling* at 10; *see* Def.-Int.'s Opp'n at 20.  Plaintiff argues that "[w]ithout

the ABS sensor, they would not be expected to allow on-board electronic safety systems

to operate."  Pl.'s Mot. at 22.

Court No. 11-00153                                              **Page 17**

While recognizing that the expectations of the ultimate purchasers of wheel hub assemblies with ABS elements may exceed the baseline expectations of the ultimate purchaser of mere wheel hub units, the Court cannot say a reasonable mind would not accept as adequate Commerce's determination that the ultimate purchasers' expectations, regardless of any bonus features, is to purchase a product that reduces friction between moving parts.

### 3.        Ultimate Use of the Product

Regarding the factor of ultimate use of the product, as with the above factor, Commerce again emphasized that "New Trend's wheel hub assemblies and TRBs covered under the Order have a similar ultimate use: reduction of friction between moving parts." *Preliminary Scope Ruling* at 10; *see* Def.-Int.'s Opp'n at 21.  While admitting that "the ABS sensor serves an additional purpose," Commerce emphasized that it "does not replace the original fundamental use of the wheel hub units/tapered roller housings covered by the scope of the Order and as described in the ITC Report." *Id.* In a similar vein with the expectations of the ultimate purchasers, discussed *supra*, while the wheel hub assembly with ABS may exceed the ultimate use of a mere TRB, the Court finds that Commerce's determination that wheel hub assemblies with ABS elements and in-scope TRBs have the same ultimate use of reducing friction between moving parts is supported by record evidence.

Court No. 11-00153                                                      **Page 18**

> 4.      **Channels of Trade in Which the Product Is Sold**

Regarding the factor of channels of trade in which the product is sold, Commerce

determined that "New Trend's wheel hub assemblies with ABS elements are sold in the

same channels of trade as TRBs and other wheel hub units covered under the Order."

*Preliminary Scope Ruling* at 11.  Plaintiff does not contest Commerce's finding of this

criterion.  *See* Def.'s Opp'n at 22 ("Power Train does not object to this finding in its brief

before this Court.").

> 5.      **The Manner in Which the Product Is Displayed and Advertised**

Regarding the factor of the manner in which the product is displayed and

advertised, Commerce determined that "integrated wheel hub assemblies, which

includes [sic] ABS elements . . . . are all advertised and displayed similarly to TRBs and

wheel hubs without ABS elements covered by the Order." *Preliminary Scope Ruling* at

12.  Plaintiff does not contest Commerce's finding of this criterion.  *See* Def.'s Opp'n at

22 ("Power Train does not object to this finding in its brief before this Court.").

Upon review of the record, the Court finds that Commerce's determination that

wheel hub assemblies with ABS elements are within the scope based upon a review of

the (k)(2) Factors is supported by the record and otherwise in accordance with law.

Court No. 11-00153                                                Page 19

### CONCLUSION

For the foregoing reasons, it is hereby

ORDERED that Commerce's *Final Scope Ruling* is sustained; and it is further

ORDERED that the stay entered by the Court on Plaintiff's motion for oral

argument (ECF No. 45) is hereby lifted; and it is further

ORDERED that Plaintiff's motion for oral argument (ECF No. 43) is hereby denied.

Judgment to enter accordingly.


                                                    /s/ Gregory W. Carman
                                                  Gregory W. Carman, Judge


Dated:  May 29, 2013
        New York, New York

UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| **POWER TRAIN COMPONENTS, INC.,** | |
| Plaintiff, | |
| v. | **Before: Gregory W. Carman, Judge** |
| **UNITED STATES,** | **Court No. 11-00153** |
| Defendant, | |
| and | |
| **THE TIMKEN COMPANY,** | |
| Defendant-Intervenor. | |

## JUDGMENT

This case having been duly submitted for decision; and the court, after due deliberation, having rendered a decision herein; now therefore, in conformity with said decision, it is hereby

**ORDERED** that Plaintiff Power Train Components, Inc.'s motion for judgment on the agency record is denied and that the challenged determination of Defendant United States Department of Commerce is **SUSTAINED**.

_/s/ Gregory W. Carman_
Gregory W. Carman, Judge

Dated:   May 29, 2013
         New York, New York

# United States Court of Appeals
## for the Federal Circuit

## CERTIFICATE OF SERVICE
### POWER TRAIN COMPONENTS, INC., v. UNITED STATES, et al.
### DOCKET NO. 2013-1474

I, Robyn Cocho, being duly sworn according to law and being over the age of 18, upon my oath depose and say that:

Counsel Press was retained by THE KLINGON LAW FIRM, Attorneys for Plaintiff-Appellant to print this document. I am an employee of Counsel Press.

On **September 20, 2013**, Counsel for Appellant has authorized me to electronically file the foregoing **Brief on Behalf Plaintiff-Appellant** with the Clerk of Court using the CM/ECF System, which will send notice of such filing to the following registered CM/ECF users:

Loren Misha Preheim, Esquire
Misha.preheim@usdoj.gov
Department of Justice
Commercial Litigation Branch, Civil Division
P.O. Box 480
Ben Franklin Station
Washington, DC 20044

Nathaniel J. Halvorson, Esquire
Nathaniel.halvorson@trade.gov
U.S. Department of Commerce
Office of the Chief Counsel for Import Administration 3623
1401 Constitution Avenue NW
Washington, DC 20230
Attorneys for United States

William Alfred Fennell, Esquire
wfennell@stewartlaw.com
Geert M. De Prest
gdeprest@stwartlaw.com
Stephanie Rose Manaker
smanaker@stewartlaw.com
Terence Patrick Stewart
tstewart@stewartlaw.com
Stewart & Stewart
2100 M Street N.W.
Washington, DC 20037
Attorneys for The Timken Company

Upon acceptance by the Court of the e-filed document, six paper copies will

filed with the Court, via Federal Express, within the time provided in the Court's

rules.

/s/ Robyn Cocho
Counsel Press

# CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS AND TYPE STYLE REQUIREMENTS

1. This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B).

<u>  x  </u>  The brief contains <u>     5,854         </u> words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii),or

<u>       </u>  The brief uses a monospaced typeface and contains <u>        </u> lines of text, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii).

2. This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6).

<u>  x   </u>  The brief has been prepared in a proportionally spaced typeface using <u> MS Word 2002 </u> in a 14 point, Times New Roman font or

<u>       </u>  The brief has been prepared in a monospaced typeface using <u>MS Word 2002 </u> in a ___ characters per inch<u>         </u> font.

<u> /s/Robert M. Klingon</u>
Robert M. Klingon